UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:23cv22233

U.S. SECURITIES AND EXCHANGE
COMMISSION,

                     Plaintiff,

v.

BHP CAPITAL NY, INC. and
BRYAN PANTOFEL,

                     Defendants.

## COMPLAINT

Plaintiff U.S. Securities and Exchange Commission (the "SEC") files this Complaint against defendants BHP Capital NY, Inc. ("BHP Capital") and Bryan Pantofel ("Pantofel" and, together with BHP Capital, "Defendants"), and alleges as follows:

## SUMMARY

1. From approximately December 2017 through mid-2022 (the "Relevant Period"), BHP Capital and its sole officer Pantofel acted as securities dealers even though they were not registered as dealers with the SEC, nor was Pantofel associated with an SEC-registered dealer.

2. BHP Capital, under Pantofel's direction and control, purchased convertible notes or warrants from penny stock issuers, converted the notes into stock at a large discount from the prevailing market price, and sold the newly issued shares into the public markets for a profit.

3. During the Relevant Period, Defendants funded 47 issuers in exchange for more than 100 convertible notes and associated warrant agreements, and converted the notes and the warrants to obtain billions of shares of newly issued common stock. Defendants then sold

approximately 4 billion of these new shares of common stock, which never traded publicly until Defendants introduced them into public markets.

4. Defendants' convertible notes and warrants business was lucrative. Specifically, Defendants generated millions of dollars in profits from their post-conversion sale of the newly issued shares.

5. Defendants' conduct was for the exclusive benefit of BHP Capital, and the vast majority of the proceeds from these activities ultimately was transferred to Pantofel as the sole owner of the company.

6. In practice, Defendants began to sell post-conversion shares soon after each conversion, and derived profits from the sale of such shares principally from the discounted acquisition price, as opposed to appreciation in the market price of the issuer's common stock.

7. Pantofel at all times controlled and had ultimate decision-making authority over BHP Capital's business decisions, including the notes that BHP Capital entered into, when to convert the debt into stock, and when to sell the stock on the secondary market.

8. Pantofel committed BHP Capital to the initial investments and directed the later acquisition and sale of discounted shares. He signed all of the agreements pursuant to which BHP Capital acquired the convertible notes and warrants, as well as the notices that BHP Capital used to convert the notes or warrants into newly issued, free-trading shares.

9. Pantofel controlled BHP Capital's bank accounts and authorized the funding wires. He also controlled BHP Capital's brokerage accounts and executed the documents needed to deposit the converted shares into BHP Capital's brokerage accounts.

10. By failing to register as securities dealers, and by Pantofel's failure to associate with a registered securities dealer, BHP Capital and Pantofel avoided the regulatory obligations that govern dealer conduct. These obligations include submitting to regulatory inspections and oversight, following financial responsibility rules targeted at brokers and dealers, and maintaining books and records in accordance with applicable regulatory requirements.

## VIOLATIONS

11. By virtue of the conduct alleged in this Complaint, BHP Capital and Pantofel have violated Section 15(a)(1) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78o(a)]. Pantofel also is liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for BHP Capital's violations of Exchange Act Section 15(a)(1).

12. Unless BHP Capital and Pantofel are restrained and enjoined, they will continue to engage in the acts, practices, transactions, and courses of business set forth in this Complaint, or in acts, practices, transactions, and courses of business of similar type and object. The SEC seeks injunctive relief, disgorgement, civil penalties, and other appropriate and necessary equitable relief, including penny stock bars.

## JURISDICTION AND VENUE

13. The SEC brings this action pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] to enjoin such acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as the Court may deem just and appropriate, including penny stock bars.

14. This Court has jurisdiction over this action pursuant to Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

15. Venue in this District is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Among other things, certain of the acts, practices, and courses of business constituting the violations of the federal securities laws alleged herein occurred within the Southern District of Florida.

## DEFENDANTS

16. **BHP Capital NY, Inc.** is a New York corporation created in 2017, with its current principal place of business in Miami, Florida. Pantofel was the founding member of BHP Capital and is its sole officer. During the Relevant Period, BHP Capital was principally engaged in the convertible notes business. It traded Pantofel's own capital, never accepted money from third parties, and has had one employee working on its behalf (the "Sole Employee"). BHP Capital has never been registered with the Commission in any capacity.

17. **Bryan Pantofel**, age 29 resides in Miami, Florida. He is the sole officer of BHP Capital and exercises ultimate decision-making authority over its business. Pantofel received periodic distributions from the company during the relevant period. He has never been registered with the Commission in any capacity.

## FACTS

18. During the Relevant Period, BHP Capital and Pantofel operated a business in Miami, Florida, through which they predominantly purchased convertible notes or warrants directly from penny stock issuers, waited for the applicable holding period for the notes to elapse (6 to 12 months) using the Rule 144 safe harbor under Section 4(a)(1) of the Securities Act of 1933, converted the notes or warrants at an agreed-upon substantial discount to the prevailing market price, and then resold the newly issued shares into the public markets.

### BHP Capital Was Controlled by Pantofel

19. Pantofel founded BHP Capital with his personal inheritance and managed all of its operations during the Relevant Period.

20. Pantofel had final decision-making authority for all convertible note and warrant financings made by BHP Capital, and signed all of the stock purchase agreements and conversion notices.

21. Pantofel determined when BHP Capital should convert (or partially convert) a note or warrant, and when to sell the post-conversion shares. He was the only person with authority to bind BHP Capital on its convertible notes and warrants.

22. Pantofel was also the only individual with access to BHP Capital's brokerage accounts.

23. BHP Capital employed one other individual during the Relevant Period (the "Sole Employee"), but Pantofel had primary responsibility for selecting issuers for funding, conducting diligence on convertible note opportunities, and maintaining relationships with issuers that BHP Capital had previously financed in an effort to service their ongoing financing needs.

### Defendants Financed Predominantly Penny Stock Issuers through Convertible Notes and Warrants

24. During the Relevant Period, BHP Capital was a well-known lender to public companies seeking financing through convertible note transactions, almost all of which were penny stock issuers trading on the over-the-counter ("OTC") markets.

25. Nearly all of the shares that Defendants sold in their business during the Relevant Period were acquired directly from issuers through note conversions and warrants, and not from purchases made in the secondary market.

26. Defendants' public sale of unrestricted, newly issued shares significantly increased the amount of shares trading publicly and the issuers' unrestricted share totals.

27. Between December 2017 and April 2020, BHP Capital executed stock purchase agreements with 47 penny stock issuers, resulting in BHP Capital fully or partially funding more than 100 convertible promissory notes and associated warrants.

28. The notes typically had: (a) a nine-month to one-year maturity date; (b) principal amounts between $6,333 and $315,000; (c) interest rates around 10%; and (d) steep prepayment penalties.

29. The notes' conversion terms also significantly favored BHP Capital, allowing the company, in its sole discretion, to convert the debt into common stock at a 20% to 50% discount to the prevailing market price after the Rule 144 holding period lapsed.

30. Most of the notes also contained original issue discounts, which entitled BHP Capital to convert the note to stock or be repaid with interest based on the face amount of the note rather than on the discounted price BHP Capital paid for it.

**Defendants Targeted Penny Stock Issuers**

31. For most of the Relevant Period, BHP Capital maintained a website that contained information regarding its business and contact information.

32. Pantofel also attended at least two investor conferences to develop and maintain industry contacts.

33. Defendants' contacts frequently referred convertible note deals to BHP Capital, and both Pantofel and the Sole Employee also cold-called and cold-emailed issuers regarding possible investment by BHP Capital.

34. On average, the Sole Employee made 20 to 30 calls per day to issuers regarding potential funding.

35. Nearly half of the issuers that BHP Capital financed through convertible notes sought additional financing from BHP Capital, with some selling BHP Capital six or more convertible notes over the relevant period.

**Defendants Were in the Business of Converting Their Notes and
Warrants to Equity, and Selling Those Newly Issued Shares into the Market**

36. Defendants often began the conversion process soon after the Rule 144 holding period for the notes expired by submitting a conversion notice to the issuer, its transfer agents, and BHP Capital's broker.

37. BHP Capital generally converted the notes in several increments because the notes' terms typically restricted BHP Capital from owning more than 4.99% of an issuer's outstanding shares.

38. Once the shares were deposited into BHP Capital's brokerage accounts, Defendants typically began selling the shares immediately, at Pantofel's direction.

39. BHP Capital generally sought to sell the shares as rapidly as the market would bear, usually within a few days or weeks of conversion.

40. Between November 2018 and mid-2022, BHP Capital sold approximately four billion newly issued shares of common stock into the public markets and earned millions of dollars in profits from the sale of shares underlying the notes.

41. Defendants' profits from the sale of the newly issued shares are attributable primarily to the discount applied to the convertible notes that BHP Capital received on the converted stock, rather than from the appreciation in share price.

**Through Their Conduct, Defendants Diluted the Equity of Existing
Shareholders and Often Depressed the Price of Issuers' Stock**

42. Defendants' repeated conversion of notes and warrants and sale of newly issued shares not only increased the number of issued and outstanding shares, but also increased each issuer's public float—namely, the shares in the hands of public investors.

43. As a result, Defendants' sales diluted the equity positions of existing shareholders and often depressed the price of issuers' stock.

44. Defendants' sales of post-conversion shares frequently were a material percentage of the volume of total trades on the days they traded.

45. For instance, Defendants' sales volumes as a percentage of the overall market volume on the days they traded the following seven penny stocks during the Relevant Period are as follows:

| Symbol | # of Trade Dates | # of Trade Dates where BHP Capital was >20% of volume | Highest Daily % of Total Market Volume | Lowest Daily % of Total Market Volume | Total Shares Sold by BHP Capital | Total Market Volume on BHP Capital Trade Dates |
|---|---|---|---|---|---|---|
| DTGI | 42 | 20 | 82.6% | 6.8% | 2,529,562 | 13,103,487 |
| GFTX | 31 | 9 | 68.8% | 2.0% | 121,085,888 | 1,315,620,112 |
| HLYK | 79 | 49 | 71.7% | 4.7% | 5,783,181 | 24,549,259 |
| MMMM | 24 | 13 | 58.8% | 1.2% | 51,249 | 269,294 |
| OTTV | 64 | 24 | 86.7% | 3.1% | 45,595,797 | 301,566,973 |
| SIML | 59 | 7 | 88.2% | 0.2% | 272,596,443 | 3,352,445,276 |
| STTH | 15 | 6 | 37.9% | 4.3% | 25,411,007 | 163,397,232 |

46. The following are examples of BHP Capital's relationship with three penny stock issuers during the Relevant Period, which highlight how BHP Capital purchased and funded convertible notes, exercised its conversion rights, and sold the resulting unrestricted, newly issues shares into the public markets for a profit:

## EWellness Healthcare Corp.

47. On or about July 30, 2019, BHP Capital entered into a convertible promissory note with EWellness Healthcare Corp. ("EWLL"). The convertible promissory note had a net principal amount of $38,500 and an original issue discount of $3,500.

48. BHP Capital began converting the note just after the holding period ended on February 7, 2020, at a 35% discount from the market price.

49. Over the next seven weeks, BHP Capital executed an additional eleven conversions on this note, and was issued a total of 120,522,485 shares.

50. BHP Capital sold all of these shares into the market, within one to three days of conversion, at a substantial profit.

## Kinerjapay Corp.

51. On or about September 3, 2019, BHP Capital entered into a convertible promissory note and associated warrant with Kinerjapay Corp. ("KPAY"), with a net principal amount of $82,500 and an original issue discount of $7,500.

52. BHP Capital began converting the note just after the holding period ended on March 6, 2020, at a 35% discount from the market price.

53. Over the next six weeks, BHP Capital executed an additional five conversions on this note, and was issued a total of 125,643,363 shares.

54. BHP Capital sold all of these shares into the market, in all cases within days of conversion, for substantial profits.

### HealthLynked Corp.

55.    On or about October 30, 2019, BHP Capital entered into a convertible promissory note with HealthLynked Corp. ("HLYK"), with a net principal amount of $108,947.37, and an original issue discount of $5,447.37.

56.    BHP began converting the note just after the holding period ended on May 1, 2020, at a 25% discount from the market price.

57.    BHP Capital executed two additional conversions on the note, and was issued a total of 1,954,870 shares.

58.    BHP Capital sold all of these shares into the market, within days of each conversion, which resulted in a substantial profit.

### CLAIMS FOR RELIEF

### FIRST CLAIM

**Violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)]**
**(Against Defendants BHP Capital and Pantofel)**

59.    The SEC re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 58 above.

60.    By engaging in the conduct described above, Defendants made use of the mails or other means or instrumentalities of interstate commerce to effect transactions in, to induce, or to attempt to induce, the purchase or sale of securities for their own account as part of a regular business while not registered with the SEC as dealers, and while Defendant Pantofel was not associated with an entity registered with the SEC as a dealer.

61.    By reason of the foregoing, Defendants violated, and unless enjoined will likely again violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## SECOND CLAIM

**Control Person Liability Pursuant to Section 20(a) for
Violations of Exchange Act Section 15(a)(1) [15 U.S.C. § 78t(a)]
(Against Defendant Pantofel Only)**

62.     The SEC re-alleges and incorporates by reference the allegations in Paragraphs 1 through 58 above.

63.     As set forth in the First Claim, BHP Capital violated Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)].

64.     At all relevant times, Defendant Pantofel controlled BHP Capital and was a culpable participant in its violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)].

65.     By reason of the foregoing, Defendant Pantofel is liable as a control person pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for BHP Capital's violations of Exchange Act Section 15(a)(1) [15 U.S.C. § 78o(a)].

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendants BHP Capital and Pantofel, as well as their members, managers, agents, servants, employees, attorneys-in-fact and persons in active concert or participating with them, from directly or indirectly making use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) while engaged in and pursuant to the regular business of buying and selling securities (not including security-based swaps, other than security-based swaps with or for persons that are not eligible contract participants) for their

own account through a broker or otherwise unless Defendants are registered as broker-dealers with the Securities and Exchange Commission, or unless they are associated with broker-dealers that were so registered.

**II.**

Ordering BHP Capital and Pantofel, jointly and severally, to disgorge, with prejudgment interest, all ill-gotten gains received, directly or indirectly, from the activities set forth in this Complaint, pursuant to 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

**III.**

Ordering BHP Capital and Pantofel to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**IV.**

Barring BHP Capital and Pantofel from participating in any offering of any penny stock, including by engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, pursuant to Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and

**V.**

Granting such other and further relief that this Court deems just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors, including, but not limited to, ordering the surrender and cancellation of any securities (including convertible notes, warrants, and shares) obtained by BHP Capital in connection with

its convertible notes business that are still held by BHP Capital.

                                            Respectfully submitted,

Date:   June 16, 2023                  /s/ Karen M. Klotz
                                            Gregory R. Bockin (Special Bar ID No. A5501158)
                                            Karen M. Klotz (Special Bar ID No. A5503057)
                                            Kingdon Kase
                                            Cecilia B. Connor
                                            Matthew Homberger
                                            United States Securities and Exchange Commission
                                            Philadelphia Regional Office
                                            1617 JFK Boulevard, Suite 520
                                            Philadelphia, PA 19103
                                            Phone: (215) 597-3100 Fax: (215) 597-2740
                                            KlotzK@sec.gov